# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

AMY JO BABCHOOK,

     *Plaintiff*,

*v.*                       CASE NO. 5:14-cv-12882

CAROLYN W. COLVIN          DISTRICT JUDGE JOHN CORBETT O'MEARA
Commissioner of Social Security,     MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008Revised Policy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*, and for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 18.)

Plaintiff Amy Jo Babchook was forty-two years old when she applied for benefits on January 27, 2011, alleging that she became disabled on September 1, 2007. (Transcript, Doc. 10 at 126, 133.) Her work history includes numerous jobs from 2001 through 2007, and work as a crew member at a fast food restaurant in 2010. (Tr. at 168.) At the initial administrative stage, the Commissioner considered whether she was disabled due to unspecified arthropathies and affective disorders. (Tr. at 74-75.) None of the impairments, alone or combined, was found to be disabling. (*Id.*) Plaintiff asked for a hearing in front of an Administrative Law Judge ("ALJ"), who would consider the application de novo. (Tr. at 87-89.)

ALJ Lawrence E. Blatnik convened the hearing on December 4, 2012. (Tr. at 28-58.) In his decision issued on March 1, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 16-24.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on June 16, 2014, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On July 23, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

**B.    Standard of Review**

Applicants for Social Security benefits go through a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g);

2

*Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)

(noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial

4

evidence standard presupposes that there is a "'zone of choice'" within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II benefits are available to qualifying wage earners who become disabled prior to the

expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since September 1, 2007, the alleged onset date, and that she met the insured status requirements through March 31, 2011. (Tr. at 18.) At step two, the ALJ concluded Plaintiff had the following severe impairments: "chondromalacia and partial anterior cruciate ligament tear of the right knee, status post-surgical repair; obesity; lumbago; and a history of pancreatitis." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 20-21.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work, as that term is defined in the regulations, 20 C.F.R. §§ 404.1567(b), 416.967(b). (Tr. at 21-22.) Under

the step-four analysis, Plaintiff was found unable to perform her past relevant work. (Tr. at 23.) Finally, at the last step, the ALJ found that a significant number of jobs existed suitable to Plaintiff's limitations. (Tr. 23-24.)

### E.    Administrative Record

### 1.    Medical Evidence

While stocking shelves at work on May 29, 2006, Plaintiff twisted her right knee as she descended her ladder. (Tr. at 200.) The pain persisted into the next day when she decided to go to the emergency room. (*Id.*) The knee was not deformed, she could flex it between forty-five and ninety degrees, she was "neurovascularly intact," the x-ray "was negative for any acute fracture," and she had "no laxity or pain on the varus and valgus stress" tests.[2] (*Id.*) However, she had "a small joint effusion," and the x-rays also suggested "mild narrowing of the medial compartment," so the examiner provided "an immobilizer" to wear during the day," crutches, and a prescription for Vicodin. (Tr. at 199-200.) In June, she told Dr. Marlize Telles that the pain had grown worse, but she had returned to work. (Tr. at 197.) The effusion had decreased and the ligaments were normal, though the examination confirmed the tenderness. (*Id.*) Dr. Telles recommended she perform light duty at work over the following week, which entailed no kneeling, squatting, climbing stairs or ladders, or prolonged walking and standing. (*Id.*) Plaintiff had a knee brace and was instructed to ice her knee and continue taking Motrin. (*Id.*) At the end of the week she returned with continuing pain, and the light work restrictions were extended. (Tr. at 202.) With Plaintiff still not experiencing improvement in July, Dr. Telles

---

[2] These stress tests examine for damage to the collateral ligaments. Anthony Luke, *Knee Physical Examination*, Univ. of Cal., Dep't of Orthopaedic Surgery, *available at* http://orthosurg.ucsf.edu/patient-care/divisions/sports-medicine/conditions/physical-examination-info/knee-physical-examination/ (last visited May 4, 2015).

ordered an MRI, which revealed a partial tear of her anterior cruciate ligament, a small osteochondral lesion on her anterior right lateral femoral condyle, and "[v]ery small right knee joint effusion." (Tr. at 195-96.)

Dr. Robert M. Doane examined Plaintiff on July 26, 2006. (Tr. at 230.) She rated the pain at level nine-out-of-ten on a visual analog ("VA") scale and described having a limp and experiencing swelling, stiffness when sitting, and increased pain when climbing stairs or rising from a chair. (*Id.*) She had not seen her physician after the injury and said that Motrin failed to relieve the pain. (Tr. at 230, 233.) During the examination she could not squat, her knee was tender, and Dr. Doane found crepitance (Tr. at 233-34), which is a cracking sound. 2 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* C-493 (2013). There was no swelling, however, and all other measures were normal, including in the neurologic examination and the measures of her stability, strength, and range of motion. (Tr. at 234-35.) The motion in her right knee ranged from -5 degrees to 140 degrees. (Tr. at 233.) Dr. Doane diagnosed chondromalacia patella, provided an injection treatment, and recommended weight loss. (Tr. at 235.) An x-ray taken the same day displayed no fractures, dislocations, or arthrosis. (Tr. at 236.)

In October she claimed the pain had increased to ten-out-of-ten on a VA scale. (Tr. at 239.) She had been attending physical therapy but by the twelfth session the notes state her "symptoms have not changed despite compliance." (Tr. at 264.) At her session that month with Dr. Doane, he no longer observed crepitance, but Plaintiff remained unable to squat. (Tr. at 241.) Her knee had the same range of motion as it did during the first examination. (*Id.*) At this point, the doctor explained, arthroscopic surgery was an option, as she could have loose

9

cartilage fragments or a meniscus tear. (Tr. at 243.) Plaintiff agreed to undergo the surgery, which would be an arthroscopic debridement that, Dr. Doane estimated, would require three days of recover before she could return to light-duty work. (Tr. at 243, 248-50.) She had two pre-surgery appointments in January 2011. (Tr. at 244.) At the first, the examination was generally consistent with the prior findings, except the crepitance had returned and she now had swelling. (Tr. at 247.) The second examination found "pain and tenderness with limited range of motion" in her extremities. (Tr. at 255.)

The surgery occurred the following month. (Tr. at 252-54.) Before the surgery her "knee range of motion was full and symmetric" without "instability." (Tr. at 253.) During the operation Dr. Doane determined that the meniscus was "completely normal." (*Id.*) His ending diagnoses were chondromalacia and "[l]ateral femoral condyle cartilage defect, grade IV full-thickness." (Tr. at 252.) At the follow-up appointment two weeks later, she rated that her pain had decreased to eight-out-of-ten on a VA scale, but her other symptoms, including limping, swelling, and knee-locking, remained. (Tr. at 257.) Dr. Doane noticed the tenderness in her lateral joint line and explained that the surgery had uncovered "significant arthrosis" and "significant chondromalacia" in her knee. (Tr. at 258.) Nonetheless, by all objective measures, she functioned normally: she had full range of motion and normal stability, strength, and gait. (*Id.*) Her "Work/Activity Status" was now "full duty." (*Id.*) The treatment notes from April mirror those from the follow-up appointment, except she had crepitance with motion in her knee despite retaining a full range of motion. (Tr. at 259, 262, 266.) Though she complained of significant continuing pain, her work status remained "full duty." (*Id.*) In fact, Dr. Doane completed a more thorough work status form that included options for various limitations; he

10

selected none of them and opined that she could return to work "[w]ithout [r]estrictions." (Tr. at 263.)

In April 2007, Plaintiff began seeing Dr. Steven Lemos. (Tr. at 280.) She explained that her knee pain had increased since the surgery and that the Motrin failed to alleviate it. (*Id.*) On examination, the doctor noted that the knee did not appear swollen, she had "slight tenderness" to palpation, resisted-knee extensions produced pain but knee flexion and rotation did not, and the other tests were negative. (*Id.*) He assessed chondromalacia patella "with transient hip and low back pain," and referred her for physical therapy. (Tr. at 280-81.) The following month she saw Dr. Jeffrey Krygier from the same office. (Tr. at 279.) She noted that physical therapy had resulted in "5% improvement" and her hip pain was "largely resolved." (*Id.*) There was "some . . . soft tissue swelling" and mild tenderness, her range of motion was the same in both legs, she had slight weakness in her hips and quadriceps but normal strength in her "ankle plantar and dorsiflexion as well as EHL strength," her knee ligaments were stable, and the patella grind test produced some pain under her left knee cap. (*Id.*) He proposed that she not kneel or bend at work, and limit her lifting. (*Id.*) With continued physical therapy he anticipated a fifty-percent improvement by the time she followed-up in a month. (*Id.*)

Yet at the next appointment she expressed frustration with the therapy, finding that it did not significantly help. (Tr. at 278.) The TENS unit she used, however, did relieve the pain and Dr. Lemos arranged for her to receive a unit for home use. (*Id.*) The examination was brief and the notes discuss only her well-healed surgical scars and the mild swelling in her knee. (*Id.*) The notes also state that she was "very active; still she's hard at work. She has actually received advancement." (*Id.*) In September, Dr. Lemos reviewed diagnostic test results that

showed "moderate to advanced chondromalacia of the lateral facet of the patella, popliteal cyst," degenerative articular erosion, and, in both knees, anteversion and antetorsion. (Tr. at 277.) This did not cause Dr. Lemos to add any diagnoses; instead he noted she had "[c]ontinued chondromalacia patella right knee." (*Id.*) They planned to test a knee brace and reevaluate her symptoms in approximately two months. (*Id.*) At the end of October she reported "some improvement" with the brace but continued frustration with physical therapy. (Tr. at 276.) They decided that she should undergo a right knee reconstruction. (*Id.*)

In November, Dr. Raimonds Zvirbulis conducted an independent medical examination related to a workers' compensation claim. (Tr. at 267-74.) Plaintiff informed him that the pain continued after the operation, particularly while standing, climbing, driving or sitting for prolonged periods, and carrying objects. (Tr. at 269.) Her lower back had begun to hurt, likely because her knee pain affected her gait, Plaintiff believed. (Tr. at 270.) Consequently, she said that working without restrictions had proven difficult and that after her April 2007 evaluation with Dr. Lemos she had been restricted to lifting no more than twenty pounds, no standing or sitting for more than one hour, and no kneeling, squatting, or climbing. (Tr. at 269.) However, in September her employer would no longer accommodate her restrictions and she had not worked since. (Tr. at 270.)

During the physical examination, Dr. Zvirbulis noted that she walked without any assistive device. (Tr. at 272.) Her right knee was not deformed and she could "actively extend it" with only "mild . . . crepitus." (*Id.*) She could flex to approximately 100 degrees, her knee was stable to "varus or valgus stress," and all other tests were negative. (*Id.*) Dr. Zvirbulis diagnosed chondromalacia patella and her prognosis was "quite guarded" in light of the

12

aggravating affect her obesity had on the arthritis. (Tr. at 273.) She would "need restrictions of no unnecessary squatting, bending or kneeling and no lifting more than 20 pounds." (*Id.*) He thought that another arthroscopic surgery "to assess the arthritic surfaces" represented the best course of action. (*Id.*)

As a result of Dr. Zvirbulis's recommendation, approval of Plaintiff's surgery was thrown into doubt. (Tr. at 275.) Dr. Lemos thought that the reconstruction would "probably help her the most." (*Id.*) The notes are slightly ambiguous about whether Plaintiff wanted to proceed with the surgery; it appears that they intended to seek approval for it. Dr. Lemos wrote, "Please see the note of October 29, 2007, if she has this approved, if she does not, we will be unable to perform the procedure." (*Id.*) However, her representative's pre-hearing brief to the ALJ states that she opted to forgo the surgery due to her financial state and because Dr. Lemos questioned its efficaciousness. (Tr. at 192.)

That is the last note from Dr. Lemos in the record, as he apparently did not "do pain management anymore," Plaintiff told Dr. Lynn C. Van Wagnen in January 2008. (Tr. at 288.) She no longer received Vicodin from him, so she arranged the appointment with Dr. Van Wagnen for a Motrin refill. (*Id.*) The examination notes are unenlightening. (Tr. at 288-89.) At the next session two months later she complained of hypertension and worsening knee pain. (Tr. at 290.) The former did not manifest in chest pains, headaches, or shortness of breath, and the latter possibly resulted from her inability to afford Vicodin any longer. (*Id.*) Again, the notes from the objective examination do not provide much information on her condition. (Tr. at 290-91.) During the following visit in July, she related two episodes of falling, which she claimed were caused by her leg buckling at the knee. (Tr. at 292.) She hurt her left shoulder

both times and said moving her arm above horizontal increased the pain, yet the next note states, "NO loss of function." (*Id.*) Similar to the other appointments, the examination notes do not detail her impairments, although this time they note the shoulder pain, the normal appearance of her extremities, and the lack of any unusual anxieties or evidence of depression. (Tr. at 293.) Plaintiff also related that her knee repair plans had been placed on hold pending a workers' compensation decision. (*Id.*) The next appointment, in late October, focused on her lower back pain, which had become suddenly aggravated during the previous weekend without any specific cause—she was not lifting or carrying anything at the time. (Tr. at 294.) Her TENS unit, which she used for her knee, cut the back pain by half. (*Id.*) The tenderness was confirmed during the examination, but the doctor also noted that her extremities appeared normal and she did not seem anxious or depressed. (Tr. at 295.) Dr. Van Wagnen diagnosed acute lumbago and provided prednisone. (*Id.*) Plaintiff's knee continued to trouble her as well. (*Id.*)

Later that week, on October 29, Plaintiff was hospitalized after experiencing abdominal pain, nausea, and vomiting over the previous day. (Tr. at 284.) The notes, which come from Dr. Van Wagnen on the day Plaintiff arrived and on her discharge, state that Plaintiff had acute idiopathic pancreatitis. (Tr. at 282-85.) Plaintiff had no history of gastrointestinal issues. (Tr. at 283.) During the examination, her epigastrium and left upper quadrant were tender, though her bowel sounds were normal and no masses were detected. (Tr. at 285.) The "[s]ensory, motor, [and] coordination exams [were] grossly normal," as were her gait and station. (*Id.*) The abdominal CT scan performed by Dr. P.C. Patel found signs "suggesting mild acute pancreatitis." (Tr. at 286-87.) She was given fluids, pain relievers and other medications, and

by November 2, when she could walk and eat without pain, she was discharged with instruction from Dr. Van Wagnen to resume normal activity.[3] (Tr. at 282.)

The following week, Plaintiff followed up with Dr. Van Wagnen. (Tr. at 296.) Her stomach remained "upset," but she was not nauseated, had not vomited, and was not feverish. (*Id.*) The back and knee pain was "unchanged," and she could not take Motrin due to the pancreatic problems. (*Id.*) The examination did not find any abdominal tenderness and Dr. Van Wagnen again noted that her extremities appeared normal and she was without any evidence of anxiety or depression. (Tr. at 297.) A few months later, in January 2009, Plaintiff still experienced stomach pain without vomiting or fever, noting she could not eat rich foods, fried foods, or chocolate. (Tr. at 207.)

In May 2009 she went to the emergency room with breathing difficulties. (Tr. at 214.) She was ambulatory in the waiting room. (Tr. at 215.) On examination her pulmonary system was normal, she displayed symmetric reflexes with normal strength and full range of motion, and her lower extremities were not swollen, did not have edema, had adequate strength, and had full range of motion. (Tr. at 215-16.) Chest x-rays were negative. (Tr. at 219.) She was diagnosed with bronchitis and discharged. (Tr. at 216-17.) Later that year she settled her workers' compensation claim. (Tr. at 139-44.)

The next record comes from a visit to Dr. Van Wagnen on January 27, 2010. (Tr. at 209.) She complained of recurrent epigastric issues, this time bloating, which was aggravated by dairy products and spicy food and relived by Zantax. (*Id.*) Her knee pain was not noted as a

---

[3] The admission-day notes, in the section discussing the history of her present illness, state that Plaintiff "has multiple other degenerative complaints and has been medically disabled as a result." (Tr. at 284.) Dr. Van Wagnen did not expound any rationale for this observation, or even state what those other complaints were.

15

present illness, only a chronic problem. (*Id.*) The examination found only mild abdominal tenderness and anterior tenderness, but no other irregularities. (Tr. at 210.) Her thoracic curvature displayed kyphosis, or rounding, but the notes state she was "mobile." (*Id.*) Plaintiff took Vicodin for the knee pain, which appeared to be "stable" according to Dr. Van Wagnen. (*Id.*) She returned in October 21, 2010 complaining of a cough; as with the last visit, her knee pain did not motivate the appointment, though it was again listed as a chronic problem and the "Review of Systems" flagged back and joint pain. (Tr. at 298-99.)

The following month, the "Review of Systems" portion of the notes again noted the back and joint pain, while the physical examination section simply said "Comments: did" under the musculoskeletal test and noted that she had no motor or sensory deficits or edema in her extremities. (Tr. at 302-03.) Her kyphosis was mild, Dr. Van Wagnen determined. (Tr. at 303.) Overall, she looked "well" and the "Assessment/Plan" section observed her hypertension was benign and did not include anything on her knee pain. (*Id.*)

At some point in 2010 she attempted to work at a fast food restaurant. (Tr. at 168.) Her earning indicate it lasted briefly (Tr. at 153), likely no more than two days. (Tr. at 192.) The next, and last, medical record Plaintiff submitted comes from an emergency room visit nearly a year later, in September 2011. (Tr. at 221-24.) While hitting golf balls at a driving range, her club swung into cement, causing her wrist to swell. (Tr. at 224.) Aside from the wrist pain, the examiners failed to find any irregularities during examination. (Tr. at 221-22.) The x-ray did not display any abnormalities and she received a wrist splint before being discharged. (Tr. at 222-24.)

16

In January 2012, psychiatrist Thomas Tsai reviewed Plaintiff's medical records for the state agency evaluating her claim. (Tr. at 62-63, 69-70.) He found that her affective disorders were non-severe: they imposed only mild restrictions and difficulties in her functioning and they never caused an extended decompensation episode. (*Id.*)

### 2.    Forms and Administrative Hearing

Plaintiff completed a function form in January 2012 as part of her claim. (Tr. at 176-83.) She claimed that she could work for only an hour before needing one hour to recover, and that she also had difficulty sitting and standing for long periods. (Tr. at 176.) She had pets, but said that she only fed them; friends and family took them for walks. (Tr. at 177.) Personal care presented a few problems, such as dressing on days her pain level was high, but she was largely independent. (*Id.*) She could cook, but nothing that took over one-half hour to prepare because she could not stand that long. (Tr. at 178.) Other chores like washing dishes and doing laundry took much longer than they used to, and she could not do outdoor work. (*Id.*) She went outside every day, and could drive short distances by herself, generally going to the store each week for less than an hour at a time. (Tr. at 179.) Old hobbies, such as gardening, playing pool, and doing "outside stuff," were no longer possible; now she read, watched television, and beaded. (Tr. at 180.) She spent time with others in person each week, participating in a church social group and contacting friends on social media. (*Id.*) Out of a list of abilities affected by her impairments, she said she struggled with lifting more than ten pounds, squatting, bending, standing for over an hour, walking over fifty yards, sitting, kneeling, climbing stairs, and completing tasks. (Tr. at 181.) Her mental abilities were unaffected: her attention span was substantial, she followed instructions well, related to authority figures well, could handle stress

17

and changes, and had not noticed any unusual behaviors or fears. (Tr. at 181-82.) She had used a variety of assistive devices including crutches after her surgery and a "brace all the time." (Tr. at 182.) She also had a cane, but did not say if or how often she relied on it. (*Id.*) Finally, she listed her medications: Motrin, which had no side effects, and Vicodin, which caused fatigue. (Tr. at 183.)

At the hearing on December 4, 2012, she testified that she lived with and was supported by a friend and the friend's husband. (Tr. at 34-35, 46.) At the time of the hearing, she no longer had a driver's license—she lost it for driving without insurance. (Tr. at 35.) She was "free to get one" again, but could not afford it and consequently she relied on friends for rides. (Tr. at 35-36.) She was working at Michael's, a craft store, as a floral designer when her accident occurred. (Tr. at 36-37.) She quit her job due to "[m]anagement harassment over my injury," she claimed, explaining that they stopped allowing her to work with restrictions and threatened to discipline her if she could not. (Tr. at 37, 50.) Specifically, the "new management" wanted her to climb ladders, whereas under the old management she could sit on a stool while working. (Tr. at 41.) Also, they increased her floral design quota. (Tr. at 51.) Since working at Michael's she had applied for numerous jobs and had "worked at several temporary employment agencies" and "at McDonald's for a very short period of time." (Tr. at 39.) On the third day at the job she quit because her knee could not take the stress of standing throughout an entire shift. (Tr. at 49-50.) She interviewed for a security position at Walmart, which she explained would have entailed "[w]alk[ing] around the store and watch[ing] people." (Tr. at 39-40.) She was uncertain whether she could "make it through a full work week" at the job, but "wanted to see if I could do it," she testified. (Tr. at 48-49.)

The main impediment to work, she believed, was her right knee, which prevented her from standing and working for eight hours in a day. (Tr. at 40.) Dr. Doane cleared her to work three days after her surgery, which Plaintiff "thought . . . was kind of strange" and felt "made the situation worse." (*Id.*) When she still had not improved, Plaintiff's doctors had considered additional surgeries, ruling them out because either she was too young or the surgery was unlikely to help. (Tr. at 41.) Other physical problems included lumbago, caused by her limping, and pancreatitis. (Tr. at 41-42.) The latter was "still lingering," but she had not experienced any "attacks" since her hospitalization in 2008. (Tr. at 42.) The worst pain was in her knee, which was constant, and her back, which alleviated when she could "get a pillow." (*Id.*) Motrin was the only medication she used and it helped "a little bit," as did icing and her TENS unit. (Tr. at 43.) Dr. Van Wagnen had stopped seeing her because Plaintiff was behind on her payments. (*Id.*)

Plaintiff estimated that she could walk less than a block, stand for twenty minutes, and lift five pounds. (Tr. at 43-44.) While sitting, she constantly had to adjust her position. (Tr. at 44.) She could bend at the waist to pick items off the floor, but could not stoop or squat. (*Id.*) Stairs also presented a problem and she rarely used them at her home, though her washer and dryer were downstairs and she went down "every two weeks or so." (Tr. at 44-45, 52.) Pain awakened her two to three times a night and, on bad days, which happened once or twice per week, she had to skip showering and believed that if she had a job on such a day, she would call in sick. (Tr. at 45, 53.) The restless nights led to naps during the day. (Tr. at 53.) She did not do any household chores and rarely cooked. (Tr. at 46.) Every few weeks she went to the

19

grocery, but could only carry light bags. (Tr. at 46-47.) The longest she could spend in a car before needing a break to walk was forty-five minutes. (Tr. at 47.)

The ALJ then asked the vocational expert ("VE") to

> Assume we have an individual that cannot lift or carry more than 20 pounds occasionally and 10 pounds frequently; let's assume that during an 8-hour work day the individual could sit for at least 6 hours, stand or walk up to 2 hours each; would need a sit/stand option that enabled her to change position every 30 to 45 minutes; she could not do any kneeling, squatting or climbing of ramps, ladders, ropes, or scaffolds; she could occasionally climb ramps or stairs.

(Tr. at 55-56.) Could that individual do any of Plaintiff's past work, he asked. (Tr. at 56.) The VE replied that the individual could perform the utility position. (*Id.*) The ALJ then adjusted the hypothetical, placing the exertional capacity at the sedentary level, which means the individual could only lift ten pounds occasionally, and less than ten pounds frequently. (*Id.*) That individual could work as an office clerk, such as an addresser (3124 positions in Michigan's lower peninsula); an information clerk, such as a call-out operator (2538 positions); and a bookkeeping accounting clerk, such as a charge account clerk (1824 positions). (Tr. at 56-57.) However, no jobs would be available if the individual needed frequent, unscheduled breaks or would miss more than one day per month. (Tr. at 57.)

## F.    Analysis and Conclusions

## 1.    Legal Standards

The ALJ determined that Plaintiff had the RFC to

> Perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) and delineated here: She can lift and carry ten pounds occasionally and less than ten pounds frequently; in an eight-hour day, she can sit at least six hours, and stand and walk up to two hours; she requires a sit/stand option that allows her to

change position every 30 to 45 minutes; she cannot squat, kneel, or climb ladders, ropes or scaffolds; she can occasionally climb ramps or stairs.

(Tr. at 21.) Light work

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.        Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld. Here, Plaintiff attacks the ALJ's credibility analysis, claiming its cursory treatment of her subjective complaints somehow skewed the RFC, though never describing the additional limitations that should have been in place. (Doc. 11 at 9-11.) I suggest, however, that substantial evidence supports the ALJ's credibility analysis and his ultimate findings.

### a.        Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant,

22

"the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). The regulations do not prescribe any similar test for opinions from "other sources." SSR 06-03p, 2006 WL 2329939, at *3. Nonetheless, both the Sixth Circuit and the Commissioner require ALJ's to apply the factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[4] and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

---

[4] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence.

---

physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

24

*Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at \*1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at \*4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at \*2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could

25

reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

26

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at

474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

**b.    Analysis**

Plaintiff lodges one argument against the ALJ's decision: his credibility analysis was erroneous. (Doc. 11 at 9-11.) She begins by discussing SSR 96-7p, which as noted above lays out the necessary elements of the analysis, including the requirement that the ALJ provide specific reasons for his conclusions and not rely solely on the absence of supporting objective evidence. (*Id.* at 9-10.) She then takes a sliver of the ALJ's analysis and casts it as the whole; specifically, the portion of the decision stating:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. at 22.) Plaintiff's entire analysis follows:

> The ALJ's consideration of Plaintiff's subjective functional complaints and assessment of his credibility do not comport with the Administration's requirements.

28

In sum, the standards applied by the ALJ prevent this court from finding that the Commissioner's decision is supported by substantial evidence. These standards, although quite deferential to the findings of the Commissioner, do have certain limitations. Chief among them is the requirement that all determinations be made based upon the record in its entirety. *Houston v. Sec'y of Health & Human Servs*[.], 736 F.2d 365, 366 (6th Cir. 1984). This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history, if that one aspect does not reasonably portray the reality of the claimant's circumstances.

Here, the ALJ's reasons given for discounting the Plaintiff's subjective complaints as not "entirely credible" were insufficient to constitute substantial evidence. Accordingly, since the ALJ's assessment of Amy Jo Babchook's residual functional capacity is driven by the consideration of "all of the relevant medical evidence," 20 CFR § 416.945(a)(3), the ALJ's RFC finding and its use in concluding Amy Jo Babchook could engage in gainful employment constitutes reversible error.

(Doc. 11 at 10-11.)

This constitutes the only analysis Plaintiff provides of the ALJ's supposed error. Earlier, in her factual statement, she quoted the ALJ's observation that no physician offered a more limited functional assessment than that encapsulated in the RFC. (*Id.* at 4.) She fails to link that quote to her analysis, however. Indeed, when analyzing the findings, she does not point to anything other than the ALJ's introductory paragraph prefacing his credibility analysis; and even then she does not explain how it errs, rather she implies that it lacked the detail SSR 96-7p requires. Yet the paragraph itself indicates that those detailed reasons would be discussed below. She insinuates that he ignored evidence, yet fails to flag what he missed. Finally, Plaintiff does not suggest how the flawed analysis resulted in an unrepresentative RFC. She does not describe any subjective evidence or how it demonstrates additional, work preclusive limitations. Plaintiff's argument thus fails to meaningfully engage the evidence.

29

I suggest that the ALJ properly analyzed Plaintiff's credibility. First, he canvassed the relevant factors spelled out in 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i). He provided a detailed description of the medical evidence, Plaintiff's subjective complaints, and aggravating or precipitating factors. (Tr. at 18-21.) Next, he noted that her daily activities provided some evidence contradicting her complaints. (Tr. at 22.) Her ability to drive, shop, interact with family and friends, and do light household chores all suggested a higher functioning level. (Tr. at 22, 177-82.) Notably, she was able to hit golf balls at a driving range, swinging the club quickly enough to cause significant wrist pain when it smashed into cement. (Tr. at 22, 224.)

Daily activities, however, do not provide particularly probative evidence, as many circuits have observed. *See, e.g.*, *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011) (noting that driving, shopping, and cooking were "hardly consistent with eight hours' worth of typical work activities"); *Barker-Bair v. Comm'r of Soc. Sec.*, No. 1:06-CV-00696, 2008 WL 926569, at *11 (S.D. Ohio Apr. 3, 2008) ("It is well recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment."). Nonetheless, the Sixth Circuit has found that an ALJ can justifiably rely on activities such as managing personal hygiene, vacuuming, driving short distances, and washing silverware. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004). The critical distinction between the cases is whether the functions necessary to complete the activities overlap with the functions the claimant says are severely impaired. Here, the ALJ did no more than note that the activities suggested Plaintiff's functioning was more robust than claimed. Golfing, in particular, could cause abnormal pressures in her knee that might prove difficult to bear if the pain was as severe as alleged. *See, e.g.*, Scott K. Lynn & Guillermo J.

30

Noffal, *Frontal Plane Knee Moments in Golf: Effect of Target Side Foot Position at Address*, 9 J. Sports Science & Med. 275, 275-76, 278 (2010) (discussing mechanics of golf swing and the possible detrimental effects on the knee joint, but focusing on left knee and noting a study that concluded there was no high risk of acute injury). Dr. Lemos's notes also support the view that Plaintiff maintained a somewhat active daily schedule in the months before the onset date; he noted that she was "very active; still she's hard at work."[5] (Tr. at 278.) Moreover, she testified at the hearing that she had worked through temporary employment agencies and actively sought other jobs, including one that required her to walk around Walmart in a security position. (Tr. at 39-40.) In any case, the ALJ did not unduly emphasize the importance of this factor.

Further, the ALJ observed that none of the treating physicians imposed restrictions that would preclude her from working. (Tr. at 22.) In fact, all of their proposals, even those close to the time of her surgery, were less drastic than the ALJ's RFC. In June 2006, shortly after her accident, Dr. Telles told her not to kneel, squat, climb stair or ladders, or walk or stand for prolonged periods. (Tr. at 197, 202.) After her surgery, Dr. Doane opined that she could work without restrictions. (Tr. at 258, 263.) Dr. Lemos wanted her not to kneel or bend and to limit her lifting. (Tr. at 279.) The recommendations from Dr. Zvirbulis were similar, limiting her from "unnecessary squatting, bending or kneeling" and restricting her lifting to twenty-pounds. (Tr. at 273.) Finally, Dr. Van Wagen never offered an opinion on restrictions and it is unclear

---

[5] "The court may consider evidence in the record, regardless of whether it has been cited by the ALJ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001)). *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). The analysis that follows merely plugs additional facts into the ALJ's analysis, it does not construct new rationales or arguments for the ALJ's action.

whether her off-hand remark in the emergency room notes that Plaintiff's "degenerative complaints" rendered her "medically disabled" came from her or the Plaintiff. (Tr. at 284.) If it were Dr. Van Wagnen's conclusion, she never gave an explanation and consequently, it would constitute the type of bare disability opinion that ALJs need not credit. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Thus, the RFC actually incorporated Plaintiff's subjective complaints to a greater degree than the opinions of her physicians.

The ALJ properly characterized the objective evidence supporting her assertions as "modest." (Tr. at 22.) *See* 20 C.F.R. §§ 404.1529(c)(3)(ii), 416.929(c)(3)(ii). Regarding her knee, the tests and x-rays at the emergency room did not indicate a severe impairment. (Tr. at 199-200.) There was some pain and effusion noted around that time, but the latter was "[v]ery small" and she continued working. (Tr. at 195-96.) Dr. Doane's examinations confirm the knee's tenderness and her inability to squat. (Tr. at 230-35, 241.) Most of the tests returned normal, including measures of her stability, strength, and range of motion, and the x-rays did not display fractures or dislocations. (Tr. at 235-36.) One pre-surgery test found a limited range of motion in her extremities (Tr. at 255); yet on the day of her surgery her "knee range of motion was full and symmetric" without "instability." (Tr. at 253.) At post-surgery appointments she claimed to have a limp and swelling but displayed full range of motion and normal strength, gait, and stability during the examination. (Tr. at 258-59, 262, 266.) Later, Dr. Lemos found only "slight tenderness" and failed to note any alarming results during the examinations. (Tr. at 278-81.) Significantly, the range of motion in both legs was the same. (Tr. at 279.) Moreover, during Dr. Zvirbulis's examination the month after her disability

allegedly began, she walked without an assistive device, could "actively extend" her right knee, the knee was stable, and all other tests were negative. (Tr. at 272.)

Dr. Van Wagnen's notes do not add much insight, generally noting that Plaintiff's extremities consistently appeared normal. (Tr. at 293, 295, 297.) The examinations at the emergency room during her visits in 2008 and 2009 found that her gait, station, strength, reflexes, and range of motion were all normal. (Tr. at 215-16, 285.) Finally, the ALJ accurately noted that the records from after 2008 were relatively sparse. (Tr. at 20.) *See* 20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(v). While this may have resulted from Plaintiff's financial struggles, as she suggested at the hearing (Tr. at 43), it is apparent from the final two years' worth of records, mostly from Dr. Van Wagnen, that even when Plaintiff did see doctors the knee issue was not the primary reason and was not actively discussed. (Tr. at 207, 209-10, 296-99, 302-03.)

Plaintiff's other impairments also received adequate treatment in the ALJ's decision. (Tr. at 22.) The lumbago symptoms were, as the ALJ wrote, "rather infrequent in nature, and have not necessitated surgical intervention, physical therapy, or other rehabilitative modalities." (*Id.*) *See* 20 C.F.R. §§ 404.1529(c)(3)(ii), 416.929(c)(3)(ii). The first mention of back pain was in Dr. Lemos's April 2007 notes, and he characterized it as "transient." (Tr. at 280-81.) Only one record suggests severe back pain, but even then she admitted that the TENS unit alleviated it by fifty-percent. (Tr. at 294.) The kyphosis was mild (Tr. at 303) and, when it was diagnosed, the notes state Plaintiff was nonetheless "mobile." (Tr. at 210.) No other record shows immobility arising from her back pain. Likewise, her pancreatitis rarely manifested. (Tr. at 22.) Plaintiff admitted at the hearing that the only pancreatitis "attack[]" occurred when she

33

was hospitalized in late 2008. (Tr. at 42.) The only other notes concerning gastrointestinal problems were from subsequent appointments with Dr. Van Wagnen in which Plaintiff complained of stomach pain, but had not experienced nausea or vomiting and had realized that certain foods triggered the pain. (Tr. at 207, 209, 296.) Her abdominal tenderness was mild during the last of those appointments. (Tr. at 210.) Finally, the ALJ also explicitly considered how Plaintiff's obesity could aggravate her symptoms. (Tr. at 22.) He appropriately relied on the objective evidence—her typically normal ambulation and musculoskeletal examination results—to conclude that the obesity did not cumulatively render her disabled. (*Id.*)

In short, I suggest that substantial evidence supports the ALJ's analysis. Plaintiff's underdeveloped argument offers the Court little guidance on how the ALJ allegedly erred, instead vaguely suggesting that he failed to explain his credibility finding. Yet as discussed above, the decision displays a close analysis of the facts. The ALJ began by describing the evidence at length and in detail, even discussing the slim evidence regarding her mental health. (Tr. at 18-20.) He applied the relevant law to those facts, analyzing her credibility under the correct factors and coming to a supportable conclusion. (Tr. at 21-22.) There is little affirmative evidence in favor of Plaintiff's contention that she is disabled. When her treating physicians examined this evidence, none of them proposed restrictions that would prevent her from working and none formulated restrictions as severe as the ALJ's. Thus the ALJ's credibility analysis has substantial support.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of

34

choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in

the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 7, 2015                              S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge



**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 7, 2015                               By s/Kristen Krawczyk
                                                Case Manager to Magistrate Judge Morris